# THOMSON *v.* WESTON.

PATENTS; INTERFERENCE; CONCEALMENT OF INVENTION.

Where, in an interference proceeding between a patentee and a subsequent applicant, it appears that the latter made an electrical measuring instrument embodying the invention in controversy in 1894 and placed it in his private experimental room, where it was seen only by employees, but where it was used frequently in making measurements, and that he did not manufacture it or apply for a patent until 1898, after he knew that his rival had been granted a patent, it was *held, following* Mason v. Hepburn, 13 App. D. C. 86, that by the concealment of his invention after completion, without reasonable excuse, until after the granting of a patent to another, he forfeited his rights in favor of the later and more diligent inventor, and that the length of the concealment was not material.

No. 177. Patent Appeals. Submitted January 15, 1902. Decided March 4, 1902.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding. *Affirmed.*

The COURT in its opinion stated the case as follows:

This is an interference proceeding the issue of which was defined in three counts as follows:

1. " Two electric measuring instruments attached to a single or common base and having their indicating-needles so located with relation to a scale-plate that independent readings may be taken at the same instant."

2. " Two electric measuring instruments attached to a single or common base, in combination with a dial-plate provided with scales for the index-needles of both instruments."

3. " Two electric measuring instruments each provided with an index-needle operatively connected with the rotary

or movable part of its own instrument, said rotary or movable parts being located in the magnetic fields between the opposite ends of a pair of energizing-magnets."

The volt-meter, for measuring the electro-motive force or pressure of an electric circuit, and the ammeter, for measuring the quantity of passing current in such circuit, were well-known devices at the time of the invention of the issue, but had not been combined in a single instrument.

The terms of counts 1 and 2 are directed to what is known as the duplex instrument, containing both a volt-meter and an ammeter so arranged in relation to each other that their respective index-needles move on the same dial-plate and show their respective measurements at the same time.

This capacity for simultaneous observation of the pressure, or voltage, and of the quantity of passing current, makes the instrument a desirable part of the equipment of an ordinary electric automobile.

Count 3 relates to the employment of the duplex instrument of a pair magnets common to the moving parts of both measuring devices, instead of separate and independent magnets for each.

The appellee, Edward Weston, holds a patent that was issued March 22, 1898, on an application filed December 7, 1897. Since the date of his invention he has manufactured and put in commercial use a great number of his duplex instruments.

The appellant, Elihu Thomson, filed his application June 21, 1898.

The tribunals of the Patent Office all agreed that Weston was clearly entitled to priority of invention as regards counts 1 and 2, and those decisions have been acquiesced in by Thomson. The controversy, therefore, involves count 3 alone.

As to this, the examiner of interferences awarded priority to Thomson; but expressed the opinion that he was not entitled to a patent because of his concealment of the invention from the public, and called the attention of the Commissioner thereto under the provisions of Rule 126.

The examiners-in-chief — one not taking part in the decision — affirmed the decision, but did not join in the recom-

mendation that patent be denied to Thomson on account of delay and concealment.

The Commissioner of Patents, on appeal, reversed that decision and awarded priority to Weston.

All the tribunals of the Patent Office agree, substantially, that Weston conceived and .disclosed the invention of count 3 about November 23, 1896, and reduced it to practice on October 21, 1897.

Thomson alleged conception about the last week of June, 1894, at which time he made sketches, explained the invention to an assistant and instructed him to make an instrument in accordance therewith; that a full-sized working device was made during July and August, 1894, and was, prior to September, tested and calibrated in the instrument-room of the General Electric Company at Lynn, Mass.; and that it has been used since said time for the purpose of testing .electrical apparatus.

Thomson is a skilled electrician and inventor of electrical measuring instruments. For these he has eight patents — the first three on applications filed October 26, 1894, and the latest on March 27, 1897.

Testifying as a witness in regard to this invention, he said that he had completed a form of volt-meter called an " astatic volt-meter," in May, 1894; that he undertook to apply this construction to an ammeter in June thereafter; that he then conceived the idea of combining the two in one instrument; that it was in his mind with particular reference to a private lighting plant then in use in his own house and which he proposed to remodel; that he desired to use the instrument to keep informed both in respect of the pressure and the quantity of the current in said plant; that he mentioned it to his assistant, Shand, gave him some instructions and directed the construction of the instrument suggested; that, returning from his vacation, August 6, 1894, he found the instrument completed; that it was a working instrument and was mounted on a switchboard in his model-room and used frequently in making measurements. It appears from

the testimony that this model-room is the private workshop of Thomson; that it is not an exhibition-room and that the public are excluded from it; that it is accessible to his assistants, and mechanics employed in the works frequently came into it for tools, etc. It was said also, that whilst there was a posted notice against admittance, Mr. Thomson was not rigid in its enforcement. It is not made to appear that any one but assistants and mechanical employees ever saw or heard of the instrument, and Thomson could remember no one but his assistant Shand using the instrument. It was not applied to, or used in, the private electric plant before mentioned.

In explanation of his failure to apply for a patent, or to manufacture the instrument, Thomson said that he was engaged in looking after the patenting of a volt-meter and ammeter separately and had a great deal of patent-work on hand; that his attention was not called specially to this instrument as a subject for patent, and being doubtful of its patentability he took no steps to that end until after he had seen the notice of the issue of the patent to Weston; then he wrote to the patent department of the General Electric Company at Schenectady, N. Y., calling attention to the Weston patent issue and referring to his instrument in a general way.

Robert Shand, the assistant before mentioned, corroborated Thomson in the matter of description and order for construction of the machine in the summer of 1894. He said that he had one Charles Silvander, a mechanic, to work on the instrument in June and when made he took it to the instrument-room where it was calibrated under charge of one Holden; that it was then taken to Thomson's private mechanical laboratory, and certain defects were remedied; that it has been in continuous use in that room since about the first of September.

Silvander identified the instrument as the one worked on by him and that had been kept in a switchboard in Thomson's laboratory and used since September, 1894.

Jameson, another mechanic, testified to the construction of the instrument in the summer of 1894.

*Mr. Albert G. Davis (Mr. W. M. Fairfax* being with him on the brief) for the appellant.

*Mr. Marcellus Bailey* for the appellee.

Mr. Justice SHEPARD delivered the opinion of the Court:

On behalf of Weston, a vigorous attack is made upon the sufficiency of this evidence to show conception and reduction to practice, under the burden of proof imposed upon Thomson not only by the prior patent of his rival, but also by his long inaction and delay.

That the instrument, which was produced during the taking of the testimony, was in fact constructed, as claimed, there can be no reasonable doubt. Whatever of doubt there may be, as affecting Thomson's claim, would seem to relate exclusively to the point of actual, successful reduction to practice. The question involves something of matter of opinion as well as of matter of fact. It is this: Whether, considering the failure to bring the instrument into use either in the private plant for which it was originally designed, or in connection with any other practical construction, as well as the delay in applying for a patent by an inventor and a manufacturer engaged in patenting and utilizing, generally, all inventions in this art, the test in the private laboratory of the inventor failed to demonstrate the practical utility of the machine, as then adjusted, and caused it to be regarded and abandoned as an experiment, for the time at least.

It is quite true, as contended by the appellee, that great stress has frequently and justly been laid upon circumstances of private and partial test and long delay thereafter, as indicating, with certainty, nothing more than an unsatisfactory, experimental use, when subsequently brought forward to overcome the patent of a diligent inventor in the same field who has not only given the benefit of his discovery to the public through the Patent Office, but also through manufacture and general introduction into commercial use. *Traver* v. *Brown,* 14 App. D. C. 34; *Warner* v. *Smith,* 13 App. D. C. 111, 113;

*Appert* v. *Schmertz,* 13 App. D. C. 117, 130; *Fefel* v. *Stocker,* 17 App. D. C. 317, 321; *Reichenbach* v. *Kelly,* 17 App. D. C. 333, 344; *Latham* v. *Armat,* 17 App. D. C. 345, 353.

This question — whether the evidence, in the light of all the attendant circumstances, was sufficiently strong to establish, beyond doubt, the fact of actual reduction to practice, under the rule applied in the cases cited, need not now be determined.

The Commissioner expressly waived it and, assuming the fact of reduction to practice, denied priority to Thomson upon another and distinct ground.

Concurring in his conclusion upon that ground, we will follow the course pursued in his decision.

That conclusion is, that Weston, although later than Thomson in conception and reduction to practice, is nevertheless an inventor and entitled, as such, to an award of priority because of the deliberate concealment by Thomson, from the public, of all knowledge of his invention and use.

The facts relating to the action of Thomson are fairly summarized by the Commissioner as follows:

" After Thomson made his instrument in 1894 he placed it in his model-room, or private laboratory, to which outsiders were not admitted, and this instrument was only seen by the employees who might go into that room, and the knowledge of this instrument and its use in the model-room was confined to Thomson and his assistant, Shand.

" The use to which Thomson put this device, whatever it may have been, was in his private model-room. The public was not made acquainted with the instrument or its use and derived no benefit whatever from it. It seems that he did not attach sufficient importance to it to take steps to obtain a patent, and he believed that it was not patentable. He deliberately concealed the invention from the public until another had patented the device and put it into extensive use."

As held by the Commissioner, the foregoing facts bring the case directly within the operation of the doctrine enounced in *Mason* v. *Hepburn,* 13 App. D. C. 86.

In that case it appeared that Mason had conceived the idea of the gun-clip in controversy, had made it and applied it to a completely-finished gun, and that the gun had then been put away in the model-room of the Winchester Arms Company, which employed Mason and was entitled to the benefit of his inventions. The gun was probably tested in the shooting-gallery of the company.

Knowledge of these facts was confined to the inventor and a few other employees of the company who had access to the model-room. Further test of the clip, than as stated above, was treated as immaterial; in fact what was done was regarded as answering the substantial requirements of the law in respect of the reduction to practice of such a device.

What was then said of the effect of that action is directly applicable to the facts under consideration in the present case:

"Although the construction and adaptation to use of the clip were within the knowledge of several persons, these were all, with Mason himself, employees of the Winchester Repeating Arms Company, for whose benefit the invention was made. They had either been called on to aid in the construction and use, or by the nature of their employment, were necessarily cognizant of it. The invention was therefore as much secreted from the public as if it had been confined to the knowledge of Mason alone. *Pennock* v. *Dialogue,* 2 Pet. 1, 19; *Kendall* v. *Winsor,* 21 How. 322. The public did not, and was not intended to receive any benefit from it during the seven years that intervened between the construction and the application for the patent. 13 App. D. C. 91."

It is true that the time of concealment in this case was something less than four years as against seven years in that. The mere difference in time, however, is not sufficient to affect the application of the principle, for it is as certain in one case as in the other that the application for the patent was solely stimulated by the publication of the patent granted to another inventor. No substantial or even plausible excuse for Thomson's inaction is disclosed by the testimony.

Again in *Mason* v. *Hepburn,* after quoting the statement of the " true policy and ends of the patent laws," made in *Kendall* v. *Winsor,* 21 How. 322, 327, it was said:

" Considering, then, this paramount interest of the public in its bearing upon the question as presented here, we think it imperatively demands that a subsequent inventor of a new and useful manufacture or improvement who has diligently pursued his labors to the procurement of a patent in good faith and without any knowledge of the preceding discoveries of another, shall, as against that other, who has deliberately concealed the knowledge of his invention from the public, be regarded as the real inventor and as such entitled to his reward. Id., p. 95."

In support of this proposition, many decisions of the courts and of Patent Commissioners were cited. Since then the practice of the Patent Office has been governed by the rule as declared and the principle has been reasserted by us in several decisions. *Warner* v. *Smith,* 13 App. D. C. 111, 115; *Esty* v. *Newton,* 14 App. D. C. 50, 53; *In re Mower,* 15 App. D. C. 144; *McBerty* v. *Cook,* 16 App. D. C. 133, 139; *Fefel* v. *Stocker,* 17 App. D. C. 317, 322; *Reichenbach* v. *Kelly,* 17 App. D. C. 333, 343.

It is true that in the majority of the above cases the decisions went upon another ground, but the principle was involved and was restated, and may be regarded as settled as far as it can be by this court.

What was said in *McBerty* v. *Cook, supra,* and has been referred to on behalf of the appellant, namely, that " the rule will not be extended to any case not coming clearly within it," was not to impair its force but to recall attention to the restricted field of its application.

The particular object of the beneficence of the patent law is the individual who first conceives, and with diligence perfects an invention. And where one has completed the act of invention his right to the reward in the form of a patent becomes complete save in two instances that may be satisfactorily shown to exist. First, he loses the right as against the public in general by a public use for the statutory period.

Second, by deliberate concealment or suppression of the knowledge of his invention he subordinates his claim, in accordance with the general policy of the law in the promotion of the public interest, to that of another and *bona fide* inventor who during the period of inaction and concealment shall have given the benefit of the discovery to the public. Viewed in the light of " the true policy and ends of the patent laws," the latter is the first to invent, and therefore entitled to the reward. As said in *Mason* v. *Hepburn:*

" The true ground of the doctrine, we apprehend, lies in the policy and spirit of the patent laws and in the nature of the equity that arises in favor of him who gives the public the benefit of the knowledge of his invention, who expends his time, labor and money in discovering, perfecting and patenting, in perfect good faith, that which he and all others have been led to believe has never been discovered, by reason of the indifference, supineness or wilful act of one who may, in fact, have discovered it long before."

The concealment of the appellant in this case having been deliberate and without reasonable excuse, the Commissioner was right in awarding priority to his opponent, and his decision will be affirmed. It is so ordered, and that the clerk certify this decision and the proceedings herein to the Commissioner of Patents as provided by law. *Affirmed.*