52 CCPA

Homer I. HENDERSON, Appellant,

v.

Donovan B. GRABLE, Appellee.

Patent Appeal No. 7236.

United States Court of Customs
and Patent Appeals.

Dec. 23, 1964.

Rehearing Denied March 4, 1965.

Melvin R. Stidham, Edward B. Gregg, San Francisco, Cal. (Robert N. Roley, Washington, D. C., of counsel), for appellant.

R. Welton Whann, Los Angeles, Cal. (Eugene O. Heberer, Los Angeles, Cal., of counsel), for appellee.

Before RICH, Acting Chief Judge, and MARTIN, SMITH, and ALMOND,

Judges, and Judge WILLIAM H. KIRK-PATRICK.*

MARTIN, Judge.

This is an appeal from the Board of Patent Interferences awarding priority of invention in Interference No. 91,037 to Grable, the Senior party.

■ The issue for determination is whether Henderson is entitled to the date of his parent application for "Well Drilling Device and Method", serial No. 284,-739 filed April 28, 1952. The answer hinges on the sufficiency of the Henderson parent application to support two limitations of the first count in interference.

Grable is involved in the proceedings on the basis of his patent 2,850,264, titled "Dual Passage Concentric Pipe Drill String Coupling", issued September 2, 1958 on an application serial No. 380,-983 filed September 18, 1953. Henderson filed a continuation of his parent case titled "Method and Apparatus for Drilling Wells", serial No. 761,502 on September 17, 1958. The Grable patent was cited against this continuation application, and subsequently the interference was declared between them on April 15, 1960, with modified claims 1 and 3 of the Grable patent in issue.

The invention is directed to improvements in composite drill pipes consisting of a scavenger pipe concentrically spaced within a larger pipe such that drilling fluids may pass downwardly in the annular space between the two pipes and return up the inner scavenger pipe. The pipe "string" which reaches down into the well is composed of "stands" or sections, each about 20 to 30 feet long, of a pair of such inner and outer pipes assembled for handling as a unit. A drill bit it attached to the lower end of the string and the drilling is accomplished by rotating the entire composite pipe string, the drilling cuttings being removed by the drilling fluid returning upwardly in the inner scavenger pipe.

The improvement which is the subject of the invention is the manner of formation of joints by which sections or "stands" of a drill pipe string are connected together in use. As noted by referring to the vertical section view of Figure 2 in both the Grable patent and the Henderson parent application reproduced below,[1] the outer pipes (Grable 13; Henderson 1)[2] are threaded together while the inner pipes (G 12; H 5) are simultaneously joined by a telescoping joint of the packing sleeve type which is sealed by an O-ring (G 126 in groove 26; H 43 in groove 42). In each stand of composite pipe, both Grable and Henderson show upper axial lugs or fins (G 27; H 40) which are welded to the inner pipe (G 28; H $W_3$)[3] and serve to concentrically position the inner pipe within the outer. These upper axial fins or lugs are attached to the outer pipe to make a rigid unit construction and to obtain correct vertical positioning of the inner pipe. Grable attaches the axial fins to the outer pipe by forming a weld 30 through a precut slot 29, while Henderson employs fins, which rest on the upper end of the outer drill pipe, and which are threaded to engage the threads of coupling collar 38. Henderson also provides intermediate radial fins 39, for centering purposes.

Both Henderson and Grable show lower axial fins or lugs (G 31; H 44) welded as shown in Grable at 32 only to the inner pipe, and as shown in Henderson

---

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge Worley, pursuant to provisions of Section 294(d), Title 28, United States Code.

1. Since Henderson's continuation application contains support for the counts there is no necessity to compare it with the Grable patent. All references to the Henderson embodiment will be to that in the parent application.

2. Hereinafter sometimes referred to as G and H.

3. The reference characters $W_1$, $W_2$ and $W_3$, designating welds in Figure 2 of Henderson, do not appear in the drawing as filed; they have been added for convenience.

## GRABLE PATENT IN INTERFERENCE

## 2,850,264

*Fig. 2.*

## HENDERSON PARENT APPLICATION

## 284,739

*Fig. 2*

to the inner pipe at $W_1$. The presence or absence of a weld at $W_2$ in Henderson and the effect of a "tolerance gap" at 45, are in issue (as item 6 of count 1 set out in the margin) and will be discussed below in some detail.

The outer pipe (G 13; H 1) is "directly" connected together in Grable at 16 by threads at 21, while in Henderson a coupling collar 38 is first securely threaded onto one stand of outer drill pipe 1. When the string is made up, an entire composite stand is threaded into this collar on the next adjacent stand. This difference in coupling the outer pipes is also at issue (as item 4 of count 1) and will be discussed below in some detail.

We are thus presented with a picture of the individual stands as composed of an outer drill pipe within which is concentrically spaced an inner scavenger pipe, the spacing being accomplished by radial fins. The inner pipe is rigidly secured at the upper end since the fins are secured to both pipes, but the lower fins, being welded only to the inner pipe, in combination with the telescoping joint of the inner pipe, permit axial and/or radial expansion of the inner pipe to compensate for differences in temperature between the downflowing drilling fluid and the up-flow of fluid and cuttings. The outer pipes of the string are rigidly connected through their threaded interengagement and thus provide for the transmission of rotation to the bit secured to the lower end of the string.

Count 1 of the interference is directed to the entire string of pipe stands made up as described above and may be broken down into nine basic items or limitations.[4] In its decision, the board stated:

"It is the position of Grable that the Henderson parent application as originally filed did not disclose the limitations of items 4 and 6 of the foregoing analysis, and that Henderson is accordingly not entitled to the benefit of the filing date of that application. Before considering his argument, we will discuss some of the more general aspects of the disclosures of the parties. These disclosures are concededly alike in their

4. In its entirety count 1 reads:
 A drill pipe string comprising:
 1. "a series of dual-passage metallic pipe stands each including an inner pipe and an outer pipe attached to said inner pipe in coaxial spaced relation,
 2. "each of said inner pipes containing an inner passage with said inner passages of successive stands being in communication with one another at their adjacent ends,
 3. "said two pipes of each stand forming radially therebetween an outer passage isolated from the inner passage of the corresponding stand with said outer passages of successive stands being in communication with one another at their adjacent ends.
 4. "each of said outer pipes having integral threaded end portions directly threadedly interengageable with the end portions of the outer pipes of successive stands to form a joint between said outer pipes and to secure successive stands together [,]
 5. "each of said inner pipes having integral end portions constructed so that adjacent end portions of the inner pipes of successive stands will fit telescopically one within the other to form therebetween fluid-passing joints having generally-cylindrical axially-extending telescopically-interfitting opposed surfaces,

 6. "said adjacent inner pipe end portions, in the fully made-up condition of said outer pipe joints, being free of axially interengageable stop surfaces which will prevent a limited range of relative axial movement between said adjacent inner pipe end portions occasioned by thermal and/or tensile differential expansion and/or contraction effects on the metal of said pipes,
 7. "one of said opposed surfaces having therein a circumferential groove; a deformable seal ring in said groove and slidably engageable with the other of said surfaces to form a seal preventing fluid leakage between said inner and outer passages;
 8. "means adjacent both ends of said inner pipe of each stand centering said ends in the outer pipe of said stand; and
 9. "means attaching said inner pipe of each stand in fixed axial position relative to the outer pipe of said stand at a single location along the lengths of the pipes of said stand."
The board indicates count 1 has omitted from claim 1 of the Grable patent, the following as an immaterial limitation:
 "Said end portions having shoulders engageable axially against one another in the full made-up condition of said joints to limit joint-tightening relative rotational movement and to transmit rotary motion between adjacent stands."

support of each of items 1–3, 5, 7 and 8, and Grable's only argument with respect to item 9 is that it was not illustrated in Henderson's parent application drawing."

Thus, as acknowledged by the board, and by appellee here, the single issue is whether Henderson's parent application provides support for the limitations in items 4 and 6 of count 1.[5] These will be discussed separately below. Neither party took testimony and appellant Henderson relies solely on his parent application to show priority.

### Item 4 The Outer Joint

Item 4 of count 1 reads:

"each of said outer pipes having integral threaded end portions directly threadedly interengageable with the end portions of the outer pipes of successive stands to form a joint between said outer pipes and to secure successive stands together [,]"

The board, holding that the Henderson parent application does not support this item, first referred to the structure in that application as follows:

"Henderson's parent application does not describe or illustrate a joint between the successive outer pipe sections in which each of these sections is provided at one end with an external screw thread and the other with an internal screw thread, so that adjacent ends of successive sections can be directly threadedly interconnected, as illustrated in Figure 2 of Grable's drawing. Instead, Henderson's interconnection between such sections was an indirect one, achieved through internally threaded coupling collars threadedly secured to externally threaded ends of successive sections of pipe to be coupled, as illustrated at 38 in Figure 2 of his drawing."

After then recognizing that the article produced and the method of assembly of the Henderson application "are very closely similar to Grable's article and method, insofar as the limitation of item 4 is concerned" the board concluded:

"In spite of the above-noted close similarity, it must also be noted that the language of Count 1 calls for "each of said outer pipes having integral threaded end portions directly [threadedly] interengageable with the end portions of the outer pipes of successive stands" (emphasis ours). On no reasonable interpretation of language can we hold that Henderson's collars 38 are integral threaded end portions of the pipes to which they are attached, or that any end portion of one pipe is directly interengageable with an end portion of the next. Priority will be awarded to Grable on the ground that the Henderson parent application does not support this count limitation. If this result is one which creates a hard case in order to avoid bad law, it will be necessary for Henderson to find some other recourse to solution of the problem, for as noted above, we may not ignore a specific claim limitation."

We are unable to agree with the board's conclusion therein.

 The Henderson application teaches that a collar 38 is first tightly screwed onto one end of each outer pipe section before the individual sections are assembled to form a string. In fact, the collar is so secured before the inner scavenger pipe section is assembled in the outer section. The latter operation involves inserting the scavenger pipe section with its upper fins 40 into the outer section so that the fins engage the threads on the collar 38 on the latter and then screwing the scavenger pipe section down until the fins rest against the upper end of pipe 1. Once the collars 38 are secured on the individual pipe sections the structure and method of assembly are effectively the same as Grable insofar as

5. Dependent count 2, calling for equal cross-sectional area of the inner scavenger passage and outer annular fluid passage presents no additional issue.

the item 4 limitations are concerned. Moreover, it is plain that there is no relationship necessary to the patentable concept of the subject matter of the counts that requires a strict interpretation of the term "integral." Rather it is our opinion that the circumstances here require that the unambiguous term "integral" be given the broadest construction the language will reasonably bear without resort to the specification from which it originated,[6] In re Kelley, 305 F.2d 909, 913, 49 CCPA 1359, 1363; Cusano v. Decepoli, 214 F.2d 134, 135, 41 CCPA 968, 970; Wirkler v. Perkins et al., 245 F.2d 502, 44 CCPA 1005, and cases cited therein, and we think such construction includes the Henderson parent application disclosure of a collar tightly screwed onto the outer pipe.

We think also that the term "directly" in the context of "directly threadedly interengageable end portions" of the adjacent stands is met by the structure of Henderson within the principle of interpretation noted above.

We note that of the eight original claims in Henderson's parent case, filed pro se, seven do not specify the type of joint between the stands of the string. The eighth recites that "the outer string of pipe is comprised of joints of pipe with threaded couplings, * * *" which in its broad sense can be taken as direct or indirect coupling by means of threads. While we do not rely on those claims, they do support appellant's contention that "the essence of the invention is not dependent upon the particular form of standard drill pipe that may be selected by [those] skilled in the art to whom the specification is addressed."

■ Appellee and the board cite numerous cases in support of classic propositions of interference law, such as, clear-

ly expressed limitations may not be disregarded, all recitations are material, equivalency of function may not be considered, and so on. We do not disagree, but a study of those cases shows that they are not apposite to the facts here. As Judge Rich stated for this court in Hall v. Taylor, 332 F.2d 844, 51 CCPA 1420, 1424:

"We find in the Draeger[7] opinion what we consider the key to determining whether a disclosure supports a claim for interference purposes * * * viz., does the disclosure *teach the gist of the invention* defined by the claim?"

See also Swain et al. v. Crittendon, 332 F.2d 820, 51 CCPA 1459.

■ We think the board, without determining that the terms "integral" and "directly" were ambiguous, erred in construing those terms only with reference to the specific Grable embodiment rather than examining them to see whether a reasonable interpretation, but one not so broad as to do violence to the language or the concept of the invention, would include the Henderson structure.

*Item 6 The Inner Joint*

Item 6 defines the structure and purpose of the joint between stands of the inner scavenger pipe thus:

"6. said adjacent inner pipe end portions, in the fully made-up condition of said outer pipe joints being free of axially interengageable stop surfaces which will prevent a limited range of relative axial movement between said adjacent inner pipe and portions occasioned by thermal and/or tensile differential expansion and/or contraction effects on the metal of said pipes, * * *".

■ Henderson's parent application *as filed* provides a "tolerance gap", item 45.

---

6. Appellant correctly points out that:
 "No apparent significance was attached to integral pipe ends; the word 'integral' does not even appear in the Grable specification; and integral ends were never claimed apart from the shoulders."

The shoulders referred to appear as Grable's items 23 and 24 of Fig. 2, and were shown old in the art and omitted from Grable claim 1 as immaterial when count 1 was formulated.

7. In re Draeger et al., 150 F.2d 572, 32 CCPA 1217.

in Figure 2 reproduced above, in these words:

"It is desirable that the taper and dimensions of the threads on the drill pipe and drill pipe couplings, be held to close tolerance so that the 'Tolerance gap', 45, may be held as narrow as possible, considering reasonable wear."

Keeping in mind that Figure 2 shows lower fins 44 welded at both W₁ and W₂, the gap 45, without more, would function as no more than a tolerance gap in the sense of machining pieces for a mechanical fit. But Henderson also disclosed that the fins 44 need not be welded to the outer drillpipe:

"In the above assembly, the fins, 44, were welded to the drillpipe, 1, to enhance the rigidity of the assembly. It will be obvious that in cases wherein the rigidity is not a factor, such as very shallow drilling, this welding can be eliminated."

That this alternate embodiment is not depicted in the drawing is immaterial.

About this tolerance gap as support for item 6 of the count, the board stated:

"There is no question in our minds that Henderson provided, in this 'tolerance gap,' support for the language of item 6 reading:

" 'said adjacent inner pipe end portions in the fully made-up condition of said outer pipe joints, being free of axially interengageable stop surfaces which will prevent a limited range of relative axial movement'

if the language stopped there. The issue, however, is not that simple. The issue is whether the parent application as filed supports this language when coupled with the following [remaining] language [of item 6] reading:

" 'occasioned by thermal and/or tensile differential expansion and/or contraction effects on the metal of said pipes.' "

The board then noted that Henderson amended his original specification on June 22, 1953 adding to the above quoted description of the tolerance gap and omission of weld W₂ statements of purpose or function:

"* * * the 'Tolerance gap', 45, may be held as narrow as possible, considering reasonable wear *and differential thermal expansion.*

\* \* \* \* \* \*

"* * * this welding can be eliminated to *permit considerable differential expansion or contraction between drill pipe and scavenger pipe.*"

The amendatory matter is italicized. The board then stated:

"It will be seen that the issue thus becomes one of whether Henderson's application as filed instructs the person skilled in the art to leave one end of the inner pipe unsecured to the outer pipe while at the same time providing a gap wide enough to allow for thermal expansion, or whether in the alternative, the person skilled in the art would design his apparatus so that it would inherently function in this manner in following only the instructions given in Henderson's application as filed."

The board concluded:

"His [Henderson's] own prosecution in the parent application shows that the idea of allowing for heat expansion was an afterthought, and there is distinct doubt in our minds as to whether the person skilled in the art would necessarily make such allowance without further instruction. It is our conclusion that the feature of providing a gap sufficient to accommodate heat expansion, together with a connection between pipes permitting such expansion, has not been proved by him to be taught or necessarily inherent in his original disclosure and we so hold."

■ We think the board erred in concluding that the feature of providing a gap sufficient to accommodate heat ex-

pansion is not inherent or taught in the Henderson parent application.

The board was not referring to the weld at $W_2$ as preventing Henderson's structure from inherently operating as required by the counts, since they recognized that he disclosed the omission of that weld. We perceive the core of the board's conclusion that Henderson did not prove inherency to be closely related to their second position, as we understand it, that without the added teaching of the expansion function one of ordinary skill in the art would not provide a "tolerance gap" sufficiently large so that the gap "inherently" took care of expansion. We do not agree.

Neither the Grable patent nor the later Henderson application specify dimensions for the expansion joint. Thus it must be accepted that the "concept" alone is sufficient to support the counts, i. e., one of ordinary skill in the art needs no more than the "concept" of accommodating thermal expansion from which to work in arriving at an operable structure.[8] We think that one of ordinary skill in that art would consider thermal expansion as a factor in providing a tolerance gap, and that without further teaching the Henderson parent discloses enough by reference to a "tolerance gap" that in so providing, one of ordinary skill would provide a gap of such size as to compensate for thermal differences.

■ We have not overlooked certain statements under "Remarks" in an amendment to Henderson's parent application that Grable argues are an admission that "a very significant feature, that is, the portion referred to in item 6 of the counts was omitted from his first disclosure in his parent application." However, the argument made in the "Remarks" relies on the feature of the expansion joint accommodating differences in thermal expansion to distinguish over the prior art. It is plainly not reasonable to construe the statements made in that context as an admission that the application lacks proper support for the feature in question.

For the foregoing reasons, we are persuaded that the original disclosure in the parent Henderson application supports the counts.

Regarding assessment of costs of printing certain materials added to the original record, we find that material was properly included in the record, and assess the costs against the appellant.

The decision of the board is reversed.

Reversed.

8. It is noted that the examiner did not object to Henderson's amendment of June 22, 1953 as new matter. In that amendment, as noted above, he added the statement of additional function, i.e., the "concept" of accommodating for thermal expansion, to the description of his structure as originally filed. The date of this amendment is prior to Grable's filing date of September 18, 1953.