**Robert C. WOOFTER, Appellant,**

v.

**Vernon E. CARLSON, Appellee.**

**Patent Appeal No. 7496.**

United States Court of Customs and Patent Appeals.

Oct. 27, 1966.

Rehearing Denied Feb. 9, 1967.

Warren E. Finken, Dayton, Ohio (Arthur Raisch, Detroit, Mich., Frank J.

Soucek, Washington, D. C., of counsel), for appellant.

Truman S. Safford, New York City (William Hintze, Harrisburg, Pa., Roger L. Hansel, Washington, D. C., of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

Appellant prosecutes this appeal from a decision of the Board of Patent Inter-

ferences awarding priority to appellee. The applications involved in the interference are:

(a) Woofter's application S.N. 426,118 filed April 28, 1954, and

(b) Carlson's application S.N. 475,733 filed December 16, 1954.

The subject matter of the interference is a sheet metal electrical connector, or terminal, illustratively shown in Figs. 3 and 4 of its Woofter application as follows:

Fig. 3.

Fig. 4.

The connector includes a female portion formed by the side wings 30 and 31 which are reversely bent upon themselves to place their longitudinal edges 32 and 33 in close proximity to the base 21 so that the spade-type male terminal 20 (shown in Fig. 4) will be received in the female portion and held in conductive electrical contact. The female connector is so formed as to grip the spade terminal under the required spring pressure to obtain such contact pressure as necessary to hold the engaged parts in electrically conductive engagement along a contact surface of substantial area.

The particular feature of the invention in issue relates to the configuration of the spring arms of the female terminal. They are concavely bowed so as to extend from the contact surface (referred to in the counts as the "web por-

tion") first downwardly and then outwardly and upwardly in what is termed "integral continuity." This construction is asserted to improve the electrical conducting properties of the connector by extending the elastic system of the spring arms to the engaged portions of the spade terminal.

The issue of the interference is presented in counts 1, 3 and 4 corresponding to claims 24, 26 and 29 [1] of appellant's application which read as follows:

1. A sheet metal electrical connector comprising a wire gripping portion and a terminal clip, said clip including a web having a contact surface thereon, opposed overhanging spring members extending from the longitudinal sides of said web and having terminal edges overlying and spaced from said contact surface to en-

---

[1]. Counts 1 and 3 had originated as claims 3 and 8 of the Carlson application. Original count 2 as presented in Woofter claim 25 had been claim 4 of the Carl-

son application. In its amended form it becomes claim 29 of the Woofter application and count 4 of the interference.

gage yieldingly therewith a contact blade, the longitudinal side portions of said web being concavely bowed so as to extend, from the web portion including said contact surface, first downwardly and then upwardly in integral continuity with said spring members respectively.

3. In an electrical connector, a terminal clip including opposed side wall portions, an integral web connecting said side wall portions, a major transversely centrally located portion of said web being flat for defining a contact surface for the clip, and inwardly directed flanges extending from said side wall portions and overhanging said web, the side portions of said web between the flat central portion and said side wall portions extending downwardly and joining said side wall portions below, relative to said flanges, the plane of said flat central portion.

4. A terminal clip for electrical connection with a substantially flat contact blade comprising a web having a contact surface thereon, overhanging spring members extending from opposed sides of said web, the ends of said members overlying and being spaced less than the thickness of the blade from said contact surface for yieldingly pressing the blade against said contact surface, the longitudinal side portions of said web being bowed to extend from the web portion including said contact surface, first downwardly and outwardly and then around the side edges of the blade in integral continuity with the respective spring members for extending the elastic system of said members to include a portion of said web underlying the blade.

The interference as originally declared on April 22, 1957 involved counts 1, 2 and 3. After a decision on motions the interference was dissolved as to count 2. It was reformed on September 22, 1960 by adding count 4. Both parties have taken testimony.

To place this entire controversy in its proper perspective it is noted that the real parties in interest are General Motors Corporation (hereafter "G.M.") as assignee of the senior party Woofter's application and AMP Incorporated (hereafter "AMP") as assignee of the junior party Carlson's application. While the contest is nominally between Woofter and Carlson as applicants, their identities and interests are so merged into the identities and interests of their respective assignees that no useful purpose is served in continuing the fiction inherent in the repeated reference to the nominal parties as if this were a contest between individual inventors. In the present contest they appear as but instrumentalities of their corporate assignees. Since the determinative issue herein relates to the activities of these assignees, we shall hereafter designate the respective parties by their corporate names. The present contest has been fought vigorously and presently appears to have been but an incident in a broader commercial struggle between these assignees. The significance of this factor will be apparent as we proceed to a resolution of what seem to us to be the central and dispositive issues here involved.

In summary these issues are:

1. Does the record establish a basis for AMP's challenge to the jurisdiction of the Board of Patent Interferences?

2. Did AMP forfeit its right to a patent by its delay in filing the AMP application in interference?

The first issue arises on AMP's motion to dissolve the interference because of alleged insufficient support for the counts in the G.M. application. The AMP position as stated in its brief is:

Although this interference was set up in a usual way by the Examiner disclosing to Woofter the claims which he was allowing to Carlson, and Woofter copying those claims into his application, it was done without the usual prerequisites; and we submit, therefore, that jurisdiction under the interference section of the Statute, 35 USC 135, could not be acquired. \* \* \*

We shall first dispose of this issue. AMP's contention is that the G.M. application did not contain a *written description* of the invention as required by 35 U.S.C. § 112, and therefore that there was no lawful application before the Patent Office at this time. Proceeding from this position AMP's argument is that there was no proper basis for the examiner to suggest the AMP claims to G.M. for purposes of an interference. As stated in its brief the AMP position is that:

Jurisdiction failed for two reasons: (1) there was no *interference* because Woofter had never given the least indication of applying for patent on the invention of the counts until he was lured into copying them by the Examiner suggesting Carlson's allowed claims "for purposes of interference"; and (2) there is no statutory *application* for patent by Woofter on the invention of the counts.

The particular portions of the counts on which AMP based its motion to dissolve relate to the longitudinal side portions of the web of the female portion of the connector. The pertinent portions of the counts upon which this argument is advanced were underlined in AMP's motion of Nov. 4, 1957 and are here reproduced as follows:

*Count 1*

\* \* \* the longitudinal side portions of said web being concavely bowed so as to extend, from the web portion including said contact surface, first downwardly and then upwardly in integral continuity with said spring members respectively.

*Count 2*[2]

\* \* \* the longitudinal side portions of said web being bowed to extend, from the web portion including said contact surface, first downwardly and outwardly and then around the side edges of the blade in integral continuity with the respective spring mem-

bers for extending the elastic system of said members to include a portion of said web underlying the blade.

*Count 3*

\* \* \* the side portions of said web between the flat central portion and said side wall portions extending downwardly and joining said side wall portions below, relative to said flanges, the plane of said flat central portion.

It is fundamental to AMP's position that the structure defined in the foregoing portions of the counts

\* \* \* results in an elastic and mechanical system of the spring members of the clip of superior performance by virtue of the avoidance of stress concentration by distributing it over a longer length and avoidance of interference with the mating blade side edges during insertion \* \* \*

The issue thus framed requires a consideration of its merits before passing to a consideration of AMP's challenge to the jurisdiction of the board. At the outset it is noted the written specification of the G.M. application contains little in the way of a formal written description of the invention as thus claimed. However, the drawing as filed in the G.M. application shows the mechanical structure of the female connector element as called for in the above quoted portions of the counts. We think one of ordinary skill in this art would know that the longitudinal overhanging side members would have to be "spring members" to function in the manner called for in the counts.

In what appears to be something of an afterthought, G.M. in the concluding paragraph of its reply brief refers to original claim 7 of its application as support for its position. Inspection of this claim does not support the G.M. position but reveals it to be like the rest of the application in requiring that considerable extraneous information, possessed by one of ordinary skill in the art, be read into it before one can conclude that the

---

2. Count 2 was in the interference when AMP's motion was made. The pertinent portion here referred to also appears in count 4 which later replaced count 2 in the interference.

overhanging wing structures of this claim are in fact the "spring members" required by the counts.

■■ The test of the right to make counts is to be found in the total disclosure. Thus, the omission of a written description in the specification of an application will not necessarily prevent the reading of a count on a structure shown in the drawing and described in general terms in the specification. Here, the function of the disclosed structure is inherent in the structure shown in the drawings forming a part of the application. Cf. Wirkler v. Perkins, 245 F.2d 502, 44 CCPA 1005; Ellis v. Shaw, 54 App.D.C. 185, 295 F. 1006, 1924 C.D. 230; Foss v. Ogelsby, 127 F.2d 312, 29 CCPA 1005.

In Padgett v. Warner, 104 F.2d 957, 26 CCPA 1403, this court observed:

> As appellee's rollers are so arranged that they are free to move longitudinally in the cups, as clearly appears from the drawings in appellee's application, it is immaterial, so far as the issue here is concerned, that no reference was made in appellee's application to such longitudinal movement.

■ It seems clear, therefore, that the Woofter application discloses the structure recited in the counts in issue. Also, the functional statement at the end of count 4 seems to be *inherently* satisfied by the structure shown in Woofter Fig. 5. Cf. Henderson v. Grable, 339 F.2d 465, 52 CCPA 920.

■ We think, therefore, that AMP's showing does not establish a sufficient factual basis to support its attack on the jurisdiction of the Board of Patent Interferences. As properly pointed out by the board:

> Whether or not the suggestion of the claims to Woofter was in accordance with the instructions in the "Manual," the claims were in fact asserted by Woofter and thus he is presently claiming the invention within the requirements of rule 201. So far as this contention amounts to a contention that the counts in issue are not patentable

in the application of Woofter by virtue of deficiencies of that application aside from the question of support for the limitations in the count, it amounts to an attack on the patentability of the counts which is not ancillary to priority and may not be considered by us under rule 258. See also Glass v. De Roo et al., 44 CCPA 723; 1957 CD 103; 239 F.2d 402; 112 USPQ 62.

We shall now consider the second issue, did AMP by its delay in filing the Carlson application, under the facts of this case, forfeit its right to a patent?

This issue is of particular public significance in the context of this case. Pertinent to this consideration are the facts that many of the events relied upon by AMP as establishing a reduction to practice occurred some twenty years ago and that the applications of both parties were filed in 1954, some 12 years ago. While responsibility for much of the delay since 1954 can be charged to the cumbersome and time-consuming interference practice in the Patent Office, there remains AMP's delay which occurred in the prior and crucial period extending from its 1946 reduction to practice to its filing of the Carlson application in 1954.

AMP is here charged with "suppression," "abandonment" and "concealment" of the invention during this period. G. M.'s view of this issue is stated in its brief as follows:

> * * * The patent laws have been enacted for the benefit of the public pursuant to the constitutional provision of Article 1, Section 8. Early disclosure of an invention to the public promotes the progress of the useful arts and the public welfare whereas delay, suppression and concealment defeats the purpose of the law. AMP did not merely delay filing on Carlson's alleged connector for some seven and one-half years, it actually concealed and suppressed the same. Surely the testimony is clear that no member of the public could or would have been given access to the cabinet in which the Carlson connector was concealed. Not even everyone in the connector department

of AMP Company was permitted access to the file or cabinet * * *. Only Kerchner and Tippett had keys thereto. Access was restricted to a very limited group of employees of AMP's connector department and as the record stands not everyone even in the connector department was given access to the file during the years 1947–1956, AMP, not Carlson, was the owner of the alleged Carlson connector invention and the real party in interest herein. AMP clearly concealed and suppressed from the public and kept to itself alone, the alleged Carlson connector. This is the concealment and suppression the Patent Act condemns because it is patently inimical to the public interest which is always dominant in any patent litigation or controversy.

The facts as stated in the foregoing are not seriously disputed. However, the issues of suppression and concealment to be decided thereon are at the heart of the controversy. Thus, AMP's brief states:

> There is absolutely no evidence of a *deliberate* intent to conceal or suppress; and, as already pointed out, the evidence shows a deliberate intent, implemented by effective action, to bring the Carlson invention and its advantages to the attention of prospective customers with a view to getting into large scale production as soon as possible * * *.

> Although it is true that when C[arlson] Ex. 9B was returned from the field, it was put for safekeeping into an "active" customer file * * * in a locked steel filing cabinet, "any person that would want anything for any of the projects" was "let into that file" * * *. Other identical samples of the Carlson connector were sent to Don Porter with C[arlson] Ex. 20 (see fourth line et seq.) and to others before Ex. 9B was completed * * * and others were shown to prospective customers by Spenser; and such showing continued from 1946–50 * * *. Spenser's samples were never returned

to AMP * * *. There is not even any basis for a conclusion that the samples sent out in March 1946 to Don Porter on the West Coast and to the others mentioned in C[arlson] Ex. 20, were returned, much less that they were suppressed or concealed in any way. This argument of GM is tantamount to an argument that GM suppressed and concealed because of some Chevrolet which was locked up in a garage. GM's attempt to make "suppression and concealment" out of the fact that AMP was prudently careful in preserving these samples, which had been tested and shown to prospective customers, is clearly erroneous, but its use of the word "deliberate" aggravates the error. * * *

 Some of the problems which arise in regard to this aspect of the controversy appear to be due to a faulty analysis of the legal requirements. Judge Learned Hand analyzed this aspect of the problem in a different factual context in Metallizing Engineering Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516 (2nd Cir. 1946). While this decision is not directly in point, we here refer to it because it contains a particularly pertinent statement of the rationale which we think should govern here. Judge Hand there stated:

> * * * it is a condition upon an inventor's right to a patent that he shall not exploit his discovery competitively after it is ready for patenting; he must content himself with either secrecy, or legal monopoly. It is true that for the limited period of two years he was allowed to do so, possibly in order to give him time to prepare an application; and even that has been recently cut down by half. But if he goes beyond that period of probation, he forfeits his right regardless of how little the public may have learned about the invention; *just as he can forfeit it by too long concealment, even without exploiting the invention at all.* Woodbridge v. United States, 263 U.S. 50, 44 S.Ct. 45, 68 L.Ed. 159; Macbeth-Evans Glass Co. v. General Electric

Co., supra, 6 Cir., 246 F. 695. *Such a forfeiture has nothing to do with abandonment,* which presupposes a deliberate, though not necessarily an express, surrender of any right to a patent. Although the evidence of both may at times overlap, each comes from a quite different legal source: one, from the fact that by renouncing the right the inventor irrevocably renders it; the other, from that fiat of Congress that *it is part of the consideration for a patent that the public shall as soon as possible begin to enjoy the disclosure.* [Emphasis added.]

It is indeed true that an inventor may continue for more than a year to practice his invention for his private purposes or his own enjoyment and later patent it. But that is, properly considered, not an exception to the doctrine, for he is not then making use of his secret to gain a competitive advantage over others; he does not thereby extend the period of his monopoly. Besides, *as we have seen,* even that privilege has its limits, for *he may conceal it so long that he will lose his right to a patent even though he does not use it at all.* \* \* \* [Emphasis added.]

We began this opinion with a reference to the significance of this proceeding as but an incident in an apparent commercial struggle between G.M. and AMP as the real parties in interest. Insofar as pertinent to this phase of the decision, the significant underlying facts are that AMP as early as 1946 had produced and probably distributed samples of a connector meeting the counts of this interference. AMP's connector 9B which was produced in 1947 was placed in a locked cabinet from then until 1954. Two AMP employees had keys to this cabinet and access to it was restricted to a limited group of employees. No patent application on this connector was filed until December 16, 1954.

There is no doubt but that AMP actively engaged in offering this connector for sale during this period. Accepted at its face value, the testimony of Spenser offered on behalf of AMP shows it was active during the period of 1946–1950 in trying to stimulate commercial interest in the AMP connector. His testimony stops just short of establishing a commercial acceptance of the terminal.

Even assuming that full credence is given to the Spenser testimony, it cannot bear on the issue of suppression of the invention by AMP during the period of 1950–1954. At best it .but reduced the delay from an 8 year to a 4 year period. There is no required time period for the loss of right to a patent by suppression of an invention. A suppression if established for a 4 year period is as effective as is one for an 8 year period.

Here AMP seeks to excuse its suppression during the period after 1950 by pleading its dependence on industry acceptance before proceeding either with production or filing of a patent application. One who delays filing his patent application under these circumstances does so at his peril for such conduct also is persuasive of suppression or concealment.

During the time of AMP's activity G. M. had, independently insofar as the present record shows, developed and tested the Woofter connector, decided at least as early as 1954 to use it on its 1955 Chevrolet line, and filed its application on April 28, 1954. Learning of this commercial activity on the part of G.M. (but apparently without being advised of the filing of the G.M. application) AMP representatives called on the Packard Electric Division of G.M. and discussed a business proposition under which AMP would tool up and manufacture the connectors which the Packard Electric Division was to supply to the Chevrolet Division of G.M.

It is AMP's position as stated in its brief:

When an interference party has been proven not to be the prior inventor, he is always tempted to raise the issue of abandonment or suppression and stimulation into renewed activity. However, in this case that can offer no es-

cape in view of the facts brought out by McClure, Tippett, Jack Thompson, Spenser and GM's Hopkins, discussed above, proving that AMP had sent samples to the trade through its local representatives; and that, quite the reverse of being stimulated into activity by GM, AMP had for years been trying to stimulate GM to use, and permit use by its suppliers, of the Carlson invention, which had been disclosed to GM before the earliest date alleged by Woofter. * * *

The G.M. position as stated in its brief is:

* * * the record is clear that AMP never manufactured or sold a terminal as shown in the Carlson application as exemplified by Carlson Exhibit 5 * *. *However, the record is clear that AMP did, at a date subsequent to Woofter's filing date, and still does, manufacture and sell terminals having a structure in accordance with the counts in issue as exemplified by Woofter Exhibit E and Carlson Exhibits 9L, 9M and 9N* * *. The striking similarity of these AMP terminals to the terminal structure disclosed in appellant's application is significant and should not go unnoticed. The subsequent copying of the Woofter terminal by appellee's employer, AMP, compels a conclusion that appellee's terminal of 1946 and the tests thereof were abandoned, and work was done on a terminal within the scope of the counts in issue only after appellee's employer AMP had learned of appellant's terminal so as to lead to the inescapable conclusion that appellee's 1946 terminal was not reduced to practice by tests sufficient to demonstrate its practical utility, and hence amounted only to an abandoned experiment. * * *

Viewing the same facts, AMP in its brief takes the following position:

GM, in its brief to this court, contends that AMP was stimulated to rush into the Patent Office with its application. * * * We submit that the facts of this case show just the reverse —GM had seen fit to copy AMP's in-

vention rather than to buy from AMP and had been keeping that secret from AMP. When it found that AMP knew that Chevrolet was getting a new harness, and wanted drawings in order to bid on the connectors, GM considered whether to let AMP know what connector design was to be used, and decided against it. Secrecy was maintained. Having decided against discussing the issue above-board, GM did appear to rush into the Patent Office. (It was a pity AMP did not, as it could have become senior party if it had done so.)

■ Our review of the record leads us to the conclusion that AMP's 1946 tests were sufficient to establish a reduction to practice of connectors meeting the counts of the interference. While they were not tested as fully as G.M. contends is necessary to establish a reduction to practice of connectors for automobile headlights, the fact is that the counts do not specify any end product use for the connectors. The tests conducted by AMP apparently established to its satisfaction that the 1946 connector was a salable item and some considerable effort was made to introduce the connector to the market. The salient facts are summarized in AMP's brief as follows:

* * * It is the fact that the terminal was designed for mass production with a contemplated initial order of nine million * * * but the market for replacement harnesses (for which it had been originally designed) had suddenly dried up in 1946 * * *. AMP was confident that after the first boom of post war production would pass, the automobile companies * * would have to improve their wiring and would come to this, although, because of their manner of operating, the automobile companies are notoriously reluctant to adopt anything new for fear it might increase service problems or be unacceptable to the whims of the purchasing public.

AMP did not give up. It had faith in this terminal and kept it in an ac-

tive customer file * * * for further reference * * * and it was urged upon GM as long as Spenser was AMP's representative and again as soon as it appeared that GM had reached the point where it was sufficiently interested in better wiring to use it * * *.

On this basis, AMP argues:

The refusal of manufacturers immediately to adopt an invention excuses delay in applying for patent until that condition can be overcome. Allen v. Blaisdell, 39 CCPA 951, 93 USPQ 428–43; 196 F.2d 527. Here there is strong reason for applying the rule, because GM itself was delaying AMP by withholding permission to use AMP's Carlson connector while proceeding with its imitation unbeknownst to AMP.

Ordinarily one would take such a statement as a prelude to an attack on originality of the G.M. invention and an assertion of its derivation from AMP. The parties are in agreement, however, that the issue of originality here fails for lack of proof. Thus, AMP's brief states:

We have not urged any issue of lack of originality in Woofter. We have recognized that there is serious question as to that, but we were unable to find proof sufficient to ask for decision on that ground. If such proof exists it should be in the possession of GM and/or Woofter. On cross-examination of Woofter and his witnesses, we probed for that * * * but we could not follow AMP's disclosure beyond the Packard men to whom Spenser had shown the Carlson samples.

Woofter proved that he had knowledge of the invention soon after he began working with Johnson in a connector design group at Packard * * but we could not prove that Woofter actually received disclosure of Carlson's invention before it came to his own mind. Spenser's testimony that he had shown the Carlson connector to a Packard engineer named Johnson fell short of the proof required to establish derivation, especially as we could not prove he was the same Johnson who was working with Woofter at the time when Johnson made the earliest drawing in GM's proofs * * * showing the new configuration defined in the counts.

These facts, it seems to us, brings this case squarely within the long-standing rule enunciated in Mason v. Hepburn, 13 App.D.C. 86 (D.C. Cir. 1898). A summary of the facts found in Mason v. Hepburn shows its close approximation to the facts here. Mason, an employee of the Winchester Repeating Arms Company, invented a new gun clip for use with magazine-firearms. Although his date of conception was about June 28, 1887, and the court found actual reduction to practice to have occurred shortly thereafter, nothing further was done in connection with the clip, and the working model was stored on the company's premises. Meanwhile, Hepburn, working independently, developed a similar clip without any knowledge of Mason's previous efforts. Hepburn filed his application on April 3, 1894, and the patent duly issued on September 11, 1894. Mason learned of Hepburn's patent and promptly filed his own application for patent on his invention of some seven years earlier. The Patent Office declared an interference and the Commissioner ruled that the evidence did not support a finding of actual reduction to practice by Mason and awarded priority to Hepburn. On appeal, the court took Hepburn's filing date as the date of his conception and reduction to practice. The court also found that Mason had reduced his invention to practice in 1887.

The only significant difference to be noted between the facts in the present case and those in Mason v. Hepburn is that Mason filed his application after issuance of Hepburn's patent and copied the claim of this patent. It was the issuance of Hepburn's patent which the court found had "spurred" Mason into activity leading to the filing of his application. Here, however, the act which apparently "spurred" AMP into activity

in 1954 was not the issuance of a patent but rather was G.M.'s adoption in 1954 of the Woofter connector for its 1955 line of Chevrolet cars. This factual difference is not significant insofar as the principle of Mason v. Hepburn is concerned. If anything, it is even more in the public interest to reduce the incentive for the type of patent activity here involved lest it give substance to the apprehensions of Mr. Justice Bradley stated in a different factual context in Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438 (1882). There Mr. Justice Bradley pointed out:

* * * an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith. * * *

Thus, it seems to us, the public interest in the present controversy is fundamentally the same as that which concerned the court in Mason v. Hepburn. For this reason we here adopt and apply the principle stated in Mason v. Hepburn, 13 App.D.C. at 95, that:

Considering, then, this paramount interest of the public in its bearing upon the question as presented here, we think it imperatively demands that a subsequent inventor of a new and useful manufacture or improvement who has diligently pursued his labors to the procurement of a patent in good faith and without any knowledge of the preceding discoveries of another, shall, as against that other, who has deliberately concealed the knowledge of his invention from the public, be regarded as

the real inventor and as such entitled to his reward.

* * * * * *

In Bates v. Coe, 98 U.S. 31, 46, [25 L.Ed. 68]; the point was not directly involved; but Mr. Justice Clifford, in affirming the right of the inventor to keep his invention secret for any length of time without forfeiting his right to a patent, coupled it with the following exception, * * *: "Unless another in the meantime has made the same invention, and secured by patent the exclusive right to make, use and vend the patented improvement. Within that rule, and subject to that exception, inventors may delay to apply for a patent." See, also, 1 Robinson on Patents, Sec. 390.

In some of the decisions the first inventor is regarded as having abandoned the field to other inventors, whilst in others he is held to have lost his right by sleeping too long upon it.

Strictly speaking, abandonment after the completion of the inventive act applies in a case where the right of the public to the use is involved, and not in one where the contention is between rival claimants merely of the monopoly.

The true ground of the doctrine, we apprehend, lies in the policy and spirit of the patent laws and in the nature of the equity that arises in favor of him who gives the public the benefit of the knowledge of his invention, who expends his time, labor, and money in discovering, perfecting, and patenting, in perfect good faith, that which he and all others have been led to believe has never been discovered, by reason of the indifference, supineness, or wilful act of one who may, in fact, have discovered it long before.

AMP, while recognizing the legal implications inherent in its delay in filing the Carlson application, argues:

The proofs of both parties in this case show a considerable time lapse between conception and filing of the application for patent. The Carlson

application was filed December 16, 1954, whereas his reduction-to-practice was in April, 1946 and the conception very shortly prior. The delay is not significant, however, because Carlson's invention was already reduced to practice. Gallagher et al. v. Smith [206 F.2d 939], 41 CCPA 734, 99 USPQ 132.

It is clear, we think, that our decision in Gallagher v. Smith should not be so extended to embrace fact situations which are not comparable to the fact situation there in issue. As stated in 206 F.2d at 946, 41 CCPA at 743;

In its simplest form, the question here may be presented as follows: What evidence of suppression, concealment (and/or abandonment) has the appellant placed before us to warrant a holding that Smith is now estopped from being adjudged, as a matter of fact and law, the first inventor and, as such, entitled to prevail?

After a review of the various reasons advanced to explain the delay in filing in the *Gallagher* case, this court concluded:

* * * Appellant has not proven by a preponderance of evidence that Smith concealed and suppressed the invention (nor abandoned the same, although we do not believe that appellant seriously contended the affirmative of such result), and we are manifestly unwilling, on the facts of this case, to allow ourselves to substitute what might, at first appraisal, be a clearly warranted presumption in place of the direct proof required by law. In summarizing, it is well to repeat that *a showing of concealment or suppression is not made out by merely establishing the fact of an extended delay in applying for a patent upon an invention previously reduced to practice.* [Emphasis added.]

The *Gallagher* decision is typical of numerous decisions in which courts have sought to avoid forfeiture of an applicant's right to a patent unless a clear case of abandonment, forfeiture or suppression was established. The facts

necessary to establish such a case vary in each instance and one can secure from the cases but general guidance to aid in making this determination.

As pointed out in Frey v. Wagner, 87 F.2d 212, 24 CCPA 823, this court has a reluctance to extend the doctrine of forfeiture stated in Mason v. Hepburn unless the record establishes that there was a concealment or suppression of the invention.

As pointed out in the *Frey* case:

The burden was upon the appellant to establish among other things, a concealment or suppression on the part of the party Wagner, if the doctrine of Mason v. Hepburn, supra, is to be applied. * * *

Here G.M. has accepted the burden referred to in the above cases and has established in the present record facts which establish a concealment or suppression of the AMP invention within the so-called "forfeiture rule" of Mason v. Hepburn which we find to be here applicable.

The facts here are comparable to those before the court in Thomson v. Weston, 19 App.D.C. 373 (1902), 1902 C.D. 521. There, after Thomson had established what the court found to be a completed reduction to practice, the instrument was placed in his model room or private laboratory to which outsiders were not admitted. The instrument was seen only by employees who might go to that room but knowledge of the instrument and its use in the model room was confined to Thomson and his assistant Shand. After Weston had received a patent, Thomson filed his application. The court stated, 19 App.D.C. at 380, 1902 C.D. at 527:

* * * And where one has completed the act of invention his right to the reward in the form of a patent becomes complete save in two instances that may be satisfactorily shown to exist. First, he loses the right as against the public in general by a public use for the statutory period. Second, by deliberate concealment or suppression of

the knowledge of his invention he subordinates his claim, in accordance with the general policy of the law in the promotion of the public interest, to that of another and *bona fide* inventor who during the period of inaction and concealment shall have given the benefit of the discovery to the public. Viewed in the light of "the true policy and ends of the patent laws," the latter is the first to invent, and therefore entitled to the reward. * * *

■ Here, the facts of concealment and suppression of the invention by AMP are very comparable to the facts in the *Thomson* case. They have been properly proven. These facts clearly support the inference that AMP was "spurred into activity" by its knowledge of G.M.'s commercial activities with the Woofter connector. It was only after AMP had knowledge of the G.M. commercial activities that it filed its application, nearly 8 years after the alleged reduction to practice of the invention which is here asserted. Under these circumstances, we hold AMP has forfeited its right to a patent. Mason v. Hepburn, 13 App.D.C. 86 (1898); Matthes v. Burt, 24 App.D.C. 265 (1904); Gordon v. Wentworth, 31 App.D.C. 150 (1908); Miller v. Hayman, 46 F.2d 188, 18 CCPA 848.

■ This resolution of the second issue leads to a reversal of the board's decision on this issue and leaves for determination the question of the apportionment of the costs of printing which has been raised by appellant's motion filed on June 29, 1964. While this appeal might have been determined on the less complete record specified in appellant's praecipe, we have used the material added to the record by appellee in arriving at our decision herein. We think, therefore, it was properly included. Appellant's motion to apportion the printing costs is denied.

Reversed.

WORLEY, C. J., did not participate.