**William R. PALMER and Charles Z. Taylor, Jr., Appellants,**

**v.**

**Chester J. DUDZIK, Appellee.**

**Patent Appeal No. 8874.**

United States Court of Customs and Patent Appeals.

Aug. 2, 1973.

---

Charles B. Park III, Charlotte, N. C., atty. of record, for appellants. Floyd A. Gibson, Charlotte, N. C. (Parrott, Bell, Seltzer, Park & Gibson, Charlotte, N. C.), of counsel.

Kurt Shaffert, Washington, D. C., Robert C. Miller, Washington, D. C. (Shaffert & Miller, Washington, D. C.), attys. of record, for appellee.

Before MARKEY, Chief Judge, and RICH, ALMOND, BALDWIN, and LANE, Judges.

RICH, Judge.

This appeal is from the decision of the Board of Patent Interferences awarding Dudzik,[1] the junior party, priority of invention as to all ten counts, which relate to a method and apparatus used in the production of "set" yarns, on the ground that the senior party, Palmer et al.[2] (hereinafter "Palmer"), had suppressed or concealed the invention within the meaning of 35 U.S.C. § 102(g). We affirm.

### The Contested Subject Matter

The invention, a simple one, solves the problem of uneven shrinkage of "set" yarns in a steam autoclave or dye bath. Set yarns are produced from "texturized" yarns which are thermoplastic yarns that have been treated through certain mechanical processes to impart stretch thereto. In the prior art process for making set yarns the texturized yarn is wound upon a hollow winding core with a predetermined, uniform amount of "overfeed" in the winding such that the yarn is loosely wound upon the core. This produces a soft package of textured yarn which is subjected to specific heat and moisture conditions in an autoclave or dye bath to produce "set" yarn.

A deficiency in this prior art process was that the autoclave or dye bath treatment did not uniformly treat the yarn but rather affected the yarn in the innermost portion of the package near the winding core differently from the remainder of the yarn in the package. Since uniformity of color and texture in the yarn are critical when the yarn is used in the production of fabric and garments, this non-uniformity was a real problem.

The discovery which both Palmer and Dudzik independently made was that this non-uniformity in the yarn was prevented if the amount of "overfeed" in the winding of the textured yarn onto the hollow winding core is made greater at the beginning of the winding process, when the layers of yarn nearest the winding core are wound, than during the winding of the remaining layers. This results in not winding the yarn as tight on the inside of the package as on the outside. It is accomplished by providing an enlarged ring or collar at the end of the winding core which engages the drive roller of the yarn-winding machine such that the core is rotated more slowly during the initial takeup of yarn which

---

1. Chester J. Dudzik, involved on his application serial No. 657,288, filed July 31, 1967, assigned to Leesona Corporation.

2. William R. Palmer and Charles Z. Taylor, Jr., involved on their application serial No. 655,596, filed July 24, 1967, and assigned to Duplan Corporation.

results in the formation of the inside portion of the yarn package.

Figs. 1, 2, and 4 of Palmer are illustrative.

[A7652]

In Fig. 1, there is shown one station of a false twist machine. Y is the yarn, 20 the take-up tube, 24 the drive roll, and 30 is the enlarged ring, preferably rubber, which the drive roll contacts until the yarn package on 20 acquires a diameter greater than ring 30. In Figs. 1 and 2 the enlarged ring is on the tube 20. Fig. 4 shows a modification in which the ring 42 is mounted on the mandrel which carries a perforated metal "dyetex" tube 40.

### Facts in Brief

With the assistance of Taylor,[3] Palmer conceived of and reduced the invention to practice in the fall of 1965 by equipping Duplan's "Leesona 553" machine, Number 7, with the ring devices. Shortly thereafter the market for "set" yarn became depressed so production was suspended and machine No. 7 sat idle on Duplan's production floor. In the fall of 1966, Palmer equipped Duplan's "Turbo" machine with the invention. The Turbo was an experimental machine which was maintained in secret by Duplan. At this time the invention came to the attention of Duplan's technical director, Mr. Strub, who, after discussion with Mr. Roberts, Duplan's corporate vice president in charge of manufacturing and president of the textured yarn division, and Mr. H. C. Fisher, an-

3. Appellants moved to amend (convert) the application from the joint inventorship of Palmer and Taylor to sole inventorship of Palmer. The board deemed any ruling on the motion moot in view of its holding awarding priority to Dudzik.

other Duplan vice president, stated in a memorandum to Fisher

> We would recommend not filing a Patent Application but simply using this system and trying our best to keep it as unpublicized as possible.

Early in 1967, Duplan equipped "ARCT" machines with the ring devices in accordance with the invention and produced and sold "set" yarn according to Palmer's invention. Appellants tell us in their brief that "These ARCT machines were located on the production floor of Duplan's Forsyth Plant among the other production machines and were readily available to be seen by anyone who was on the production floor, including all production personnel and visitors."

Meanwhile, appellee Dudzik independently conceived the invention on May 8, 1967, and reduced it to practice on May 9, 1967.

In June 1967, a Mr. Daniel Fisher of Leesona Corp. visited Strub of Duplan and advised him of Dudzik's invention. Strub realizing it was the same as Palmer's invention, then conferred with Duplan's patent counsel and reversed his earlier recommendation, advising that a patent application be filed on Palmer's work. This was done post haste. Dudzik filed a week after Palmer.

### The Board's Decision

The board made several findings of fact including the following:

3. Palmer actually reduced the invention of the counts to practice, independently of Dudzik, in the fall of 1965.

4. By June 5, 1967, Dudzik actually reduced the invention of the counts to practice, independently of Palmer.

\* \* \* \* \* \*

13. Relative to the ARCT machine [of Duplan], \* \* \* yarn was processed thereon in accordance with the invention in April 1967 \* \* \*. Further, as of June 20, 1967, over 18,000 pounds of yarn, processed on the ARCT in accordance with the invention, had been shipped to Coral Sportwear \* \* \*.

14. The record for Palmer shows conclusively that Duplan had disclosed to no one outside that company other than filing the application, what the method or the equipment of the invention of the counts was, even as recently as July 1969, the date testimony was taken on behalf of Palmer. In this regard we note the testimony of Taylor \* \* \* and especially of Edward Silver, the Development Manager at Duplan \* \* \*.

On the law, the board held that Palmer had concealed the invention of the counts within the meaning of 35 U.S.C. § 102(g) [4] and on that ground awarded priority to Dudzik. The board explained its holding as follows:

> In other words, under the circumstances of this case we believe that Dudzik, a subsequent inventor of the subject matter of the counts in issue who diligently pursued his labors in attempting to procure a patent in good faith and without any knowledge of the preceding discoveries of another, Palmer, should as against that other, who has deliberately concealed the knowledge of his invention from the public, he regarded as the real [5] inven-

---

4. § 102. Conditions for patentability; novelty and loss of right to patent

A person shall be entitled to a patent unless—

\* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it.

5. Mason v. Hepburn used the expression "real inventor," which is not an apt ex-pression. Both parties were "real" inventors in the sense of having made the invention independently. From the opinion as a whole it is clear that what the court meant was that the second inventor, de facto, would be considered the first inventor, de jure, and the one entitled to the patent. Another way of looking at it is that, as between the two, the only one entitled to a patent is the second inventor.

tor and as such entitled to his reward under the patent laws. Mason v. Hepburn * * * [13 App.D.C. 86, 1898 C.D. 510 (1898)].

The board did not rely, although noting that it could have, upon Palmer's having been "spurred into activity" by the visit of Daniel Fisher to Duplan because it found Palmer's concealment of the invention to be a fact and § 102(g) sufficient ground for its holding without considering any spurring into activity.[6]

The board then answered appellants' argument that concealment or suppression does not apply here because the time between Duplan's decision to keep the invention unpublicized and its subsequent reversal of that decision, and the filing of the Palmer and Dudzik applications, "all took place within a period of time much shorter than the one year period prescribed in the statute with respect to public use, commercialization, etc." The board noted, first, that "the issue of public use is not before us in this proceeding" and then characterized appellants' argument as based upon appellants' inability "to find any cited case where the time between the decision to conceal the invention and the filing of the application by the concealer or suppressor is less than the statutory bar of one year relative to public use." The board further answered appellants' argument by citation of Howard v. Bowes, 31 App.D.C. 619, 1908 C.D. 547 (1908), which represented just such a case from the days when the public use statutory bar period was two years.

Next, the board answered appellants' assertion that no concealment should be found because Duplan's commercial use of the invention commenced three months prior to filing the Palmer application, well within the one-year grace period which appellants maintained was provided by Congress for an inventor to decide whether to file a patent application on his invention. Appellants argued in their brief before the board, and so argue here, that:

* * * Congress has provided that an inventor must file his application for patent within one year of any publication, public use or offer for sale. This period of one year is the time which Congress has determined is reasonable to permit the invention to be perfected, commercial feasibility to be determined, and generally to permit an inventor to decide upon a course of action with respect to his invention, which may include commercialization during the period. There is nothing in the statute or reported decisions precluding the inventor from changing his mind during this one year statutory period. For example, he may commercialize the invention and then decide not to commercialize it so long as he applies for a patent within one year of his commercialization. There is simply no basis for holding that an inventor who, during this one year period, determines initially to keep his invention as unpublicized as possible while he works to perfect the invention to the point of commercialization, is thereafter forever barred from changing his mind. Certainly where he changes his mind well within the statutory period and there has been no

---

6. The board said:

Nor do we deem it necessary in deciding the question before us, to rely as well we might, on Palmer's being "spurred into activity" by the visit of Dan Fisher to Duplan, supra, since it has been held that the doctrine enunciated in 35 U.S.C. § 102(g) may properly be applied where the proof indicates deliberate suppression and concealment with nothing more. See Gallagher v. Smith, 206 F.2d 939, 41 CCPA 734; Dewey v. Lawton, 347 F.2d 629, 52 CCPA 1573. Incitation to activity is a factor to be considered for whatever aid it may give in determining the intent of the party alleged to have concealed. Stresau v. Ipsen, 77 F.2d 937, 22 CCPA 1352. In the case before us, however, there is no issue of Palmer's intention as to concealment; the intention was clearly stated; the concealment by Palmer is a fact. See also Howard v. Bowes, 31 App.D.C. 619 (1908), 1908 C.D. 547.

injury or harm to the public or anyone else, there is no public policy or good reason demanding that he forfeit his invention.

The board rejected appellants' contention because, as supported by Finding No. 14, above, "the record clearly shows that it is the yarn produced by the process and the apparatus of the counts which was in commerce, not the process and apparatus themselves. * * * Commercialization of the yarn was not a disclosure of the invention to the public."

*Appellants' Arguments Here*

Appellants maintain that no suppression or concealment exists within the meaning of § 102(g) or Mason v. Hepburn, supra. Specifically, they contend that anyone familiar with texturing machines viewing Duplan's machines, which were equipped with the invention, would recognize the invention, and since the machines maintained in Duplan's Forsyth Plant under only normal factory security were readily available to the public, this is sufficient to negate suppression or concealment. Appellants tell us that their Leesona 553 machine equipped with the invention, which was not used by Duplan due to the depressed market conditions, "sat on the production floor of Duplan's Forsyth Plant in full view of all employees of Duplan and all visitors passing through the plant for at least one year." Furthermore, appellants tell us, the ARCT machines which were placed in commercial production of yarn in accordance with the invention "were on the production floor among all of Duplan's other production equipment and in full view of all employees of Duplan and all visitors passing through the plant." Thus, appellants contend Duplan's commercial use of the invention was such that "knowledge of the invention was made accessible to the public," and therefore Duplan's action negated the effect of Strub's memorandum wherein he said the invention ought to be maintained in secret.

Appellants also argue, alternatively, that Duplan's commercial use of the invention in such a manner that knowledge of the invention was available to the public "purged" Duplan of any suppression or concealment of the invention. As appellants' brief explains it:

The sole basis for the doctrine of abandonment, suppression and concealment is that the public would be deprived of the *enrichment of the art,* or the *advancement of the progress of science and the useful arts* which would occur were it not for the abandonment, suppression or concealment of the invention. If one who may have commenced a suppression or concealment of the invention subsequently takes affirmative action to eradicate that suppression and concealment and to commercially use the invention under circumstances where knowledge of the invention is made accessible or available to the public, then such a person has purged himself of any previous wrongdoing which may have been attributable to him because of his previous suppression or concealment. This is particularly true where the person took such affirmative action to make the invention accessible or available to the public prior to anyone else's activity with respect to that same invention or, in other words, prior to anyone else's entry into the field.

Appellants argue further that under the doctrine of Mason v. Hepburn four conditions must be met to have suppression or concealment:

1. An actual reduction to practice by the inventor against whom the doctrine is to be invoked.

2. An unreasonable and unexplained period of inactivity after the reduction to practice from which to infer an intent to conceal or abandon the invention, or a deliberate, intentional suppression or concealment of the invention.

3. Entry into the field by a subsequent inventor who has made the

invention in good faith, believing himself to be the first inventor.

4. A spurring into renewed activity of the first inventor upon receipt of knowledge of the rival inventor's entry into the field.

The last three conditions are claimed to be unfulfilled because, in appellants' view, Duplan had machines equipped with the invention in commercial production of yarn before Dudzik's invention and before Duplan learned of it.

Appellants contend that neither § 102(g) nor the Mason v. Hepburn doctrine shortens the one-year period they claim to have within which to decide whether or not to patent Palmer's invention. Appellants say:

By placing the Palmer invention in public use within the meaning of 35 U.S.C. § 102(b) before Mr. Dudzik's conception and reduction to practice, Duplan had started the one year period within which Duplan could file a patent application on this invention, and Duplan had one year from the date of first public use of the Palmer invention on the ARCT machines within which to file such an application. The fact that Duplan decided to file early in this public use period upon learning of Mr. Dudzik's entry into the field does not bring this case under 35 U.S.C. § 102(g) or the Mason v. Hepburn doctrine since Duplan had already taken steps to *"enrich the art"* by placing the invention into commercial use under circumstances which have been consistently held to make knowledge of an invention accessible or available to the public.

Finally, appellants make the following interesting argument based upon the hypothesis that Duplan's use of the invention before the Dudzik date of invention, as found by the board, would be a statutory bar to Dudzik under 35 U.S.C. § 102(a). As appellants see it,

\* \* \* if Duplan had not filed a patent application and had continued its use of the invention under these same circumstances, then Duplan

would have had a 35 U.S.C. § 102(a) defense to any patent obtained by Mr. Dudzik. Since it did file a patent application, Duplan, on the very same facts, finds itself under censure by the Board and faced with forfeiture of its rights and an uncertain future due to the spectre of a patent infringement suit. This is anomalous indeed.

Dudzik contends, and we think correctly, that the facts found by the board and supported by the record establish that Duplan concealed the invention within the meaning of § 102(g).

### OPINION

■ If it were truly established that Duplan's acts, rather than the Strub memorandum and the testimony, evinced that there was no concealment of the invention, then we could agree with appellants that there was no concealment under § 102(g). However, the board's finding of fact No. 14 indicates that use of the invention by Duplan in the Forsyth Plant was not inconsistent with Duplan's stated intention to use the system and try to keep it as unpublicized as possible.

The board relied upon testimony of appellant Taylor and of Edward Silver, Development Manager at Duplan, for its finding that Duplan disclosed the invention to no one outside the company.

Taylor testified, in answer to the question whether any person outside of Duplan had been told by Duplan of the invention, that "As far as I know, it has not. Now don't misunderstand me. I know that the knowledge of that ring is not out even within our company." Taylor further testified as follows (question numbers omitted):

Q During the time that the number seven 553 machine was equipped with the mandrels as described, the mandrels of this invention covered by the counts of this interference, was anyone not an employee of Duplan Corporation toured through and shown this particular machine?

A No, sir. They haven't even been shown these machines.

Q What are you referring to now?

A Number 40.

Q In other words, the equipment put on the ARCT machine?

A Yes.

Q That's even true down through this day?

A To today, yes, sir.

Q Why is that? Why do you refrain from showing customers or potential customers the machines embodying this invention?

A I would say number one, it is none of their business how we process our yarn, no more than our throwing instructions are, are personal. Each member of our company is under contract not to divulge processes of operation, and I feel that we take it seriously.

Silver's testimony includes the following:

Q So it's your testimony then until the market picked up you would have no occasion to tell anyone about this invention?

A That's right.

Q Well, when the market did pick up, did you tell anyone of the invention?

A No sir.

Q Even when the market picked up, no one knew that they could come to Duplan for a superior set yarn, that is a set yarn that had better inside-outside package characteristics?

A Yes, sir, that became general knowledge from our customers after we started shipping this type yarn to them.

\* \* \* \* \* \*

Q I believe there is testimony that the market picked up again sometime in the fall of 1966?

A That sounds logical.

Q So at that time it became known?

A When we got our machines back in production using the invention, sometime in January or February of '67. I would say within a couple, three months of that, that Burkyarns [a customer of Duplan] knew that our product was superior to our competitors' for uniformity.

Q And this was the product that you were making by the method of the invention in the counts of this interference?

A Yes, sir.

Q Did they then know how you were making it?

A No, sir.

Q That is they did not know what the method of the invention in the counts of this interference was?

A No, sir.

Q Or for that matter what the equipment of the invention of the counts of this interference was?

A That's right.

Q Did anyone else outside of Duplan know?

A Not that I know of, sir.

Q And this is still true to your knowledge?

A Yes, sir.

We believe that the above testimony fully supports the factual finding of the board that Duplan had not disclosed the invention to anyone outside of the company. This, coupled with the following testimony, which indicates that the invention was not necessarily apparent even to one skilled in the art who may have toured Duplan's plant, supports the legal conclusion of the board that Palmer concealed the invention within the meaning of § 102(g). Strub, Duplan's technical director, testified that even he did not or would not observe the invention in the machines equipped therewith, as follows:

Q Have you taken any visitors there in the last four or five years?

A Oh, certainly.

Q Have you toured the plant with them?

A Yes, sir.

Q Do you happen to know where the number seven 553 machine is located in that plant?

A In a general way, yes.

Q Did you take any visitors past that machine?

A Not to show them any parts of it. It happens to be next to a wall and aisle, and we walk down the aisle.

Q But you didn't point it out?

A No, sir.

Q Did you happen to take notice of it?

A A long time ago.

Q Did you happen to notice on any occasion that at least part of it was equipped with mandrels for dytex tubes such as Exhibit No. 2?

A I wouldn't have observed it as such, no.

Q You never took notice of that?

A Roy walked me past one day and said, "There is our 553 with the dytex tubes." But I am sure the thing was just sitting idle.

Q Well, when he did that, did you understand the significance of what he had said?

A To the extent that we were able to make yarn on that machine if we had to.

Q What do you mean "make yarn"? You mean wind yarn on dytex tubes?

A. Right.

Q With the differential overfeed on the inside of the package?

A We didn't discuss any real details on it.

Q Did you happen to notice whether those dytex tube mandrels had the enlarged drive rings on them?

A No, I didn't notice them particularly.

Q Did you ever observe any of the ARCT machines in the plant equipped?

A This I have done recently, yes, sir.

Q Equipped in accordance with this invention?

A Right.

Q How recently?

A Oh, within two or three months.

Q But not before this patent application was filed?

A No.

Accordingly, we affirm the decision of the board that Palmer concealed the invention within § 102(g), thus forfeiting his right to a patent in favor of the later inventor, Dudzik. Since the board stated that it was deciding priority "On the basis solely of the strict working of the statute," it is not strictly necessary to answer appellants' argument that the conditions of Mason v. Hepburn were not fulfilled. However, because the board cited Mason v. Hepburn for its legal conclusion that Palmer should "be regarded as the real inventor," we will note that the facts drawn from the testimony of Taylor, Silver, and Strub do not support appellants' assertions that the last three conditions of Mason v. Hepburn are not met here. For example, Duplan not having made the invention accessible or available to the public, as we have found, prior to Daniel Fisher's June 1967 visit to Strub at Duplan, the decision thereafter by Duplan to file a patent application certainly represents "A spurring into renewed activity of the first inventor upon receipt of knowledge of the rival inventor's entry into the field."

While we have concluded that Duplan's use of the invention was not such that *knowledge* of the invention was made available to the public, there is a separate theme running throughout appellants' arguments that either there was no suppression or concealment of the invention in the first place, or—if

there was—Duplan purged itself of it. This is the contention that *commercial use* of the invention by Duplan somehow so enriched the art or made the benefits of the invention available to the public as to prevent a finding of suppression or concealment, despite the fact that, as has already been shown, the nature of the invention which produced the superior commercial product was neither disclosed to the public nor determinable by examining the product.

So far as we know, this issue has never been decided in the context of "suppression" or "concealment" under § 102(g), although we recognize that commercial use, without more, has long been a basis for finding a public use of the invention under other portions of § 102. We do not think that a finding of suppression or concealment is negated merely because a secret use of the invention has been commercial. To be sure, the public may have received some benefit from such use of the invention in the sense of being able to get the improved "set" yarn. But this alone has not, to use appellants' words, so "enriched the art" as to negate a finding of concealment within § 102(g). The public has learned nothing about the invention.

In Thompson v. Weston, 19 App.D.C. 373, 1902 C.D. 52 (1902), the de facto first inventor, Thompson, reduced his invention, a combined ammeter-voltmeter, to practice and placed it in his private laboratory which was not open to outsiders where *use of the invention* was restricted to Thompson and his assistant. After Weston patented the invention, Thompson filed his application. The court awarded priority to Weston, noting, at 19 App.D.C. at 380, 1902 C.D. at 527, that

\* \* \* where one has completed the act of invention his right to the reward in the form of a patent becomes complete save in two instances that may be satisfactorily shown to exist. First, he loses the right as against the public in general by a public use for the statutory period. Second, by de-

liberate concealment or suppression of the knowledge of his invention he subordinates his claim, in accordance with the general policy of the law in the promotion of the public interest, to that of another and *bona fide* inventor who during the period of inaction and concealment shall have given the benefit of the discovery to the public. Viewed in the light of "the true policy and ends of the patent laws," the latter is the first to invent, and therefore entitled to the reward.

The facts in *Thompson* do not indicate whether the public would have received any benefit from Thompson's secret use of the invention, but this personal use by Thompson and his assistant certainly did not prevent a finding of concealment or suppression, the court noting that the doctrine of Mason v. Hepburn applied where it is the *knowledge of the invention* which is concealed or suppressed.

In Doulett v. Muther, 51 App.D.C. 201, 277 F. 600, 1922 C.D. 101 (1922), the Court of Appeals of the District of Columbia considered the question of concealment of the invention, under the law of Mason v. Hepburn, where the de facto first inventor of a tool for setting invisible eyelets in shoes had maintained the invention in secret from unfriendly competitors. The court held that the rule of Mason v. Hepburn did not apply, noting that Doulett had commercially used the invention in such manner that "[k]nowledge *of the invention,* therefore, was sufficiently general to insure its preservation." (Our emphasis.) The court stated at 277 F. 602:

We agree with the Examiner of Interferences that the conduct of Doulett was prompted solely by a desire to prevent the appropriation of his invention by what he conceived to be unfriendly interests, and not by any desire to conceal or suppress it. In the first place, the machine was in daily use in the factory where he was employed. One member of the firm was familiar with its use, and, as already noted, some half a dozen wit-

nesses, most of whom were peculiarly skilled in the art, were equally familiar with it. *Knowledge of the invention, therefore, was sufficiently general to insure its preservation, and, because the character of the invention was such as to render its appropriation easy*, the conduct of Doulett was consistent and reasonable, in the circumstances. [Emphasis ours.]

 We think that the principles of the above quotation are still valid today and that the question whether suppression or concealment under 35 U.S.C. § 102(g) is negated ought to be determined by asking whether the public has gained *knowledge of the invention* which will *insure its preservation* in the public domain. Here the commercial use conveyed no knowledge of the invention to the public. Accordingly, we do not find that such use negates a legal conclusion that Palmer concealed the invention within the meaning of § 102(g).

 Appellants' assertion that 35 U.S.C. § 102(b) gives Duplan an absolute one-year period from the date of first public use of the Palmer invention within which to file an application, was answered correctly in the negative by the board. The purpose and rationale for the one-year grace period of § 102(b) is entirely foreign to the way appellants would apply it. Section 102(b) provides a one-year period during which an inventor may perfect his invention and prepare and file his application, testing it in public, if necessary. The section actually encourages earlier disclosure, publication, or public use of the invention, through which the public may gain knowledge of it. It does not, however, have any bearing on the rights of an inventor who, after his reduction to practice of the invention, conceals it while another makes the same invention and proceeds to apply for a patent, as is the case here.

 Finally, appellants have noted that their *commercial* use of the invention may be a statutory bar under § 102(a) to Dudzik's obtaining a patent

on it, and they assert that it is therefore anomalous to deny them priority. The answer to this is twofold: First, it has not been determined that Duplan's use of the invention would be a bar under § 102(a) and that question is not before us. Secondly, as has often been noted, a decision in an interference on *priority* does no more than determine which of two or more inventors is *not* entitled to a patent because another was legally first. It does not determine, as appellants suggest, that the first inventor in law will be granted a patent. It is the Patent Office which grants patents, not this court. See In re Arkley, 455 F.2d 586, 59 CCPA 804 (1972) and Glass v. DeRoo, 239 F.2d 402, 44 CCPA 723 (1956). The only question with which we are here concerned is which of the parties has the better right to a patent, assuming, arguendo, that there is no impediment to granting a patent to the winner on the priority issue. The policy governing our decision has been fully stated in Brokaw v. Vogel, 429 F.2d 476, 57 CCPA 1296 (1970).

A brief word is in order in response to appellants' argument that "Duplan purged itself of any wrongdoing which it may have committed" in keeping the Palmer invention secret. Their brief says,

Duplan's affirmative activities in commercializing this invention clearly eradicated or cured any loss or damage which the public may have suffered * * *.

There is here no question of wrongdoing or of loss or damage to the public. Appellee, citing *Brokaw*, has neatly expounded the true nature of the situation:

It may be suggested that to the extent that this defense has the ring of *Mea Culpa* to it, it seems to imply that a quality of wrongdoing accompanies the act of concealment of inventions. This seems quite contrary to the actual rationale for the applicable law, namely that an inventor, once he has reduced his invention to practice, may choose between the alternative

courses of trying to maintain it in secrecy or applying for a patent thereon. That there is nothing nefarious about the former course is amply demonstrated by the fact that the common law (and equity) will come to his aid in protecting his secret. The condition which the law does impose on the inventor, and which Appellants are unwilling to accept, is that once he has elected the former he risks that a second inventor of the same invention will be able to secure a patent on it and impose his limited monopoly against him. In view of the policy goal to which the concealment of invention doctrine is directed, this is a fair and just result.

The decision of the board is affirmed.

Affirmed.